2020V   /SD/ms
CRAIG CARPENITO
United States Attorney
By:   SARAH DEVLIN
Assistant United States Attorney
970 Broad Street, Suite 700
Newark, New Jersey 07102
Tel.:  973.645.2740
Sarah.Devlin3@usdoj.gov

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. |
| v. | : | Civil Action No. |
| TWO AFRICAN ELEPHANT (LOXODANTA AFRICANA) IVORY TUSKS, | : : | VERIFIED COMPLAINT FOR FORFEITURE *IN REM* |
| Defendants in rem. | : | |

Plaintiff the United States of America (the "Government"), by its attorney Craig Carpenito, United States Attorney for the District of New Jersey, for its verified complaint (the "Complaint") alleges, upon information and belief, as follows:

## I.   NATURE OF THE ACTION

1. This action is brought by the United States of America seeking forfeiture of the following property:

   Two African Elephant (*Loxodanta Africana*) Ivory
   Tusks,

(hereinafter referred to as the "Defendant Property").

2. The Defendant Property is subject to seizure and forfeiture to the United States pursuant to 16 U.S.C. § 1540(e)(4)(A), as wildlife possessed, sold,

purchased, offered for sale or purchase, transported, delivered, received, carried, shipped, or exported in violation of the Endangered Species Act and the regulations promulgated thereunder.

3. The Defendant Property is further subject to forfeiture pursuant to 16 U.S.C. § 1540(e)(4) because the claimant failed to file a Wildlife Declaration for the Defendant Property, another independent violation of the Endangered Species Act, 16 U.S.C. § 1538(e), and federal regulations pertaining to imported wildlife, 50 C.F.R. § 14.61.

4. The Defendant Property is further subject to forfeiture to the United States pursuant to 19 U.S.C. § 1595a(c)(2)(B) because its importation or entry requires a license, permit or other authorization of an agency of the United States Government and the Defendant Property was not accompanied by such license, permit, or authorization, to wit, a valid CITES Import Permit and re-export certificate, in accordance with 50 C.F.R. § 23.20(e).

5. The Defendant Property is further subject to forfeiture pursuant to the Endangered Species Act of 1973 (the "ESA"), 16 U.S.C. § 1540(e)(4)(A) and the African Elephant Conservation Act of 1988 (the "AECA"), 16 U.S.C. § 4224(e) because it was imported in violation of 16 U.S.C. § 4223(1)'s moratorium on the importation of raw ivory.

## II. JURISDICTION AND VENUE

6. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355.

7.   Venue is proper pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture took place in the District of New Jersey.

8.   The Defendant Property is currently in the custody of the United States Department of the Interior, U.S. Fish and Wildlife Service ("USFWS"), in its Office of Law Enforcement facility in Elizabeth, New Jersey.

### III.   LEGAL BACKGROUND

#### A.   The Convention on International Trade in Endangered Species ("CITES")

9.   The United States has been a party to the Convention on International Trade in Endangered Species of Wild Fauna and Flora, Mar. 3, 1973, 27 U.S.T. 1087, T.I.A.S. No. 8249 (entered into force July 1, 1975) ("CITES"), since March 3, 1973.  There are currently 183 countries, including the United States, that are signatories to CITES.

10.   The purpose of CITES is to protect species that are, or may become, threatened with extinction by international trade.  CITES established a system of import and export restrictions to protect these species from overexploitation through international trade.  Different levels of trade regulation are provided depending on the status of the listed species and the contribution trade makes to the decline of the species.  CITES lists the affected species on Appendices I, II, and III to the treaty, with each appendix specifying trade controls corresponding to the threat level facing the species listed therein.

11.   Article I(a) of CITES defines "species" as "any species, subspecies, or geographically separate population thereof."  Article I(b) defines "specimen"

as "(i) any animal or plant, whether alive or dead; (ii) in the case of an animal: for species included in Appendices I and II, any readily recognizable part or derivative thereof . . . ."

12.  CITES operates by creating a system of permits to closely regulate the trade in listed species. Each country that is a party to CITES must report all of the permits to the CITES Secretariat in Geneva, Switzerland every year for use in reviewing whether a species requires additional conservation measures.

13.  CITES requires each signatory country to prohibit shipments that violate CITES and to take measures to enforce CITES. Additionally, CITES requires each country to implement measures that penalize CITES violations, and that provide for the confiscation of specimens imported in violation of CITES. Signatory countries may adopt domestic laws that are stricter than what CITES requires, but must at a minimum enact laws that ensure compliance with CITES.

14.  Violations of the CITES permit regulations undermine worldwide conservation efforts as well as the treaty obligations of the United States.

15.  Appendix I to CITES lists the most highly protected species. It includes those species that are threatened with extinction or whose survival is or may be affected by trade. The importation or exportation of an Appendix I species for any purpose — including non-commercial shipment — is authorized only in exceptional circumstances.

16.  In order to trade in any species listed in Appendix I, the exporter must first obtain both a valid CITES Appendix I Export Permit or Re-export

Certificate from the exporting country and a valid CITES Appendix I Import Permit from the country of import.  *See* CITES art. III, §§ 2, 3; 50 C.F.R. § 23.20(e).

17.  A CITES Appendix I Export Permit can be obtained only if the CITES Scientific Authority of the exporting country has made a determination that trade in this specimen will not be detrimental to the survival of the species and that the specimen was legally acquired under the domestic laws of that country.

18.  A CITES Appendix I Import Permit can only be obtained if the CITES Scientific Authority of the importing country has made a determination that the trade in this specimen will not be detrimental to the survival of the species and that the imported specimen will not be used for commercial purposes.

19.  As further set forth below, all species of African Elephant (*Loxodanta africana*) are listed on Appendix I and have been listed in a CITES appendix since 1976. The sole exception is that elephant populations from Botswana, Namibia, South Africa and Zimbabwe are listed on Appendix II.

20.  As a matter of Federal law, it is unlawful to import into the United States (absent limited, defined exceptions) any wildlife or wildlife products listed on CITES Appendix I unless both an import permit issued by the importing country and either a valid foreign export permit issued by the country of origin or a re-export certificate from the country of re-export are obtained prior to such exportation. 50 CFR §§ 23.13, 23.2.

### B. The Endangered Species Act

21. In the United States, the CITES treaty is enforced through the Endangered Species Act of 1973 (hereinafter the "ESA"), 16 U.S.C. § 1531 *et seq.,* and its accompanying regulations, 50 C.F.R. Parts 17 and 23.

22. The Endangered Species Act defines "fish or wildlife" as "any member of the animal kingdom . . . and includes any part, product, egg, or offspring thereof, or the dead body or parts thereof." 16 U.S.C. § 1532(8).

23. The ESA specifically prohibits the import, export or possession of any specimen contrary to the provisions of CITES, 16 U.S.C. § 1538(c)(l).

24. The ESA regulations provide detailed instructions regarding the need for proper CITES permits. *See* 50 C.F.R. Part 23. These regulations include a requirement that each importation of an Appendix I specimen be accompanied by a valid foreign CITES Export Permit or Re-export Certificate and a valid CITES Import Permit. *See* 50 C.F.R. § 23.20(e).

25. Title 16, United States Code, Section 1538(a)(1)(G) provides that it is unlawful for anyone to violate any regulation pertaining to any threatened species of fish or wildlife. The threatened species special rule for African elephant, 50 C.F.R. § 17.40(e), is such a regulation.

26. The ESA authorizes the USFWS of the Department of the Interior to seize any specimen imported, exported, or possessed in violation of the ESA or implementing regulations, and mandates that such specimen is subject to forfeiture. 16 U.S.C. § 1540(e)(4)(A).

27. A CITES Import Permit is required before an Appendix I specimen is imported into the United States, even if the specimen is part of one's household effects. *See* 50 C.F.R. § 23.15(e)(1). However, the CITES household effects exemption does not apply if a country prohibits or restricts the import of the item. 50 C.F.R. § 23.15(b).

28. 50 C.F.R. § 17.40(e) provides that it is unlawful to import or export any member of the species *Loxodonta africana*, whether dead or alive, or any part or product thereof.

29. 50 C.F.R. § 17.40(e)(1) defines ivory as any African elephant tusk and any piece of an African elephant tusk. Raw ivory is defined as any African elephant tusk and any piece thereof, the surface of which, polished or unpolished, is unaltered or minimally carved.

30. Because the African elephant (*Loxodonta africana*) is a species listed as threatened, then the Section 4(d) special rule in 50 C.F.R. §17.40(e) flatly prohibits the import into or export from the United States of raw African elephant ivory unless it is a sport-hunted trophy, imported for law enforcement purposes, imported for genuine scientific purposes or is an antique. 50 C.F.R. § 17.40(e)(4).

    **C.**    **The African Elephant Conservation Act**

31. After determining that the CITES and ESA protections were insufficient to protect the rapidly declining elephant populations against extinction, Congress enacted the African Elephant Conservation Act of 1988, 16 U.S.C. §§ 4201 *et seq.* (the "AECA").

32. On June 9, 1989, pursuant to authority granted in the AECA, the FWS issued a moratorium on ivory imports.

33. 16 U.S.C. §§ 4222 *et seq.*, restricts the import of raw and worked African elephant (*Loxodonta africana*) ivory into the United States and the export of raw ivory out of the United States. *Id.* § 4223. As required by section 2202 of the AECA, 16 U.S.C. § 4222, there was a moratorium on imports of raw and worked African elephant (*Loxodonta africana*) ivory in effect when the Defendant Property was imported into the United States on March 5, 2020. 54 Fed. Reg. 24,758 (June 9, 1989). It is unlawful under the AECA to import any raw or worked African elephant (*Loxodonta africana*) ivory for which a moratorium is in effect. 16 U.S.C. § 4223(1).

### III. FACTUAL ALLEGATIONS

#### A. The African Elephant

34. African elephants are the largest land mammals on Earth. Their distinguishing features include, among other things, their long trunks, enormous ears, ivory tusks, and their thick and wrinkly skin.

35. For more than a century, populations of African elephants have been on the decline. It is estimated that there were 12 million elephants in the early 1900s. It was estimated that there were around 400,000 African elephants remaining in 2016.

36. Historically, African elephants have been killed for their ivory tusks. Prohibiting the trade in ivory from elephants has been the subject of both U.S. and international conservation efforts since the 1970s.

37. The African elephant *(Loxodonta africana)* is among the species accorded the highest protection under CITES.  It is listed on Appendix I and has been listed in CITES since 1976.  *See* 50 C.F.R. §§ 23.7(a)(3), 23.91.

38. The African elephant *(Loxodonta africana),* has been listed as "threatened" under the Endangered Species Act since May 12, 1978, 50 C.F.R. §17.11, and is subject to the Section 4(d) special rule in 50 C.F.R. §17.40(e).

39. International trade of elephant ivory requires a CITES permit and, in the United States, an ESA permit, as well as meeting the exemption requirements of the AECA.  There is a moratorium on raw ivory trade in the United States with the exception of antiques as long as they meet all the requirements defined by Director's Order 210.  There is also a moratorium on the trade in raw elephant ivory under the AECA.

**B. <u>The Attempted Importation of the Defendant Property</u>**

40. As set forth above, import permits for wildlife listed in Appendix I to CITES (including elephants) can be obtained only if the CITES Scientific Authority of the importing country has made a determination that trade in this specimen will not be detrimental to the survival of the species and that the imported specimen will not be used for commercial purposes.  In the United States, the agency authorized to issue certificates authorizing import of listed wildlife is the United States Fish and Wildlife Service's Division of Management Authority.

41. On March 5, 2020, Anna Lena Schindler-Perten (hereinafter "Schindler-Perten") arrived at Newark Liberty International Airport on a United Airlines flight from Switzerland.

42. Travelers entering the United States at its ports of entry are subject to inspection by Customs and Border Protection ("CBP") officers for compliance with United States immigration, customs, and agricultural regulations.

43. In the international arrivals terminal of Newark Liberty International Airport, Schindler-Perten encountered a CBP Agriculture team. Schindler-Perten had in her possession two elephant tusks wrapped in blankets, which were contained within her personal baggage.

44. CBP personnel saw that Schindler-Perten was in possession of the Defendant Property—two raw Elephant ivory tusks. CBP detained the Defendant Property for further inspection by U.S. Fish and Wildlife Service Inspectors.

45. Upon arrival, USFWS conducted a physical inspection of the Defendant Property.

46. The Defendant Property, which Claimant attempted to import from Switzerland to the United States, consists of a pair of raw African Elephant tusks with silver collars connected to each other by a silver link chain. *See* Exhibit A.

47. USFWS inspectors' physical inspection of the Defendant Property verified that the Defendant Property did in fact consist of elephant ivory. Based on the weight and shape of the Defendant Property, along with the Schreger

lines[1] present on the Defendant Property, USFWS inspectors were able to positively identify the Defendant Property as elephant ivory.

48. During this inspection, Schindler-Perten provided the USFWS inspectors with a Swiss CITES re-export certificate for the Defendant Property. The CITES re-export certificate was facially invalid because it failed to identify the wildlife by subspecies, or to provide the country of origin, date the wildlife was taken, country of last re-export or date of last re-export.

49. USFWS inspectors also conducted an interview of Schindler-Perten. During the interview, Schindler-Perten stated that the Defendant Property was from an African elephant, and had been given to her grandfather in the Sudan in 1975 and that her parents had inherited the Defendant Property upon her grandfather's death. Schindler-Perten initially stated that she was importing the Defendant Property for her parents, however, she then stated that she was importing the Defendant Property for use in her own home and would not be going to her parent's permanent residence.

50. The CITES permit that Schindler-Perten provided identified her as the exporter and the importer of the Defendant Property.

51. When asked why she had stated that she was importing the Defendant Property on behalf of her parents, Schindler-Perten stated that she was importing the Defendant Property for her own personal use as her parents felt that transferring the Defendant Property from their residence in Switzerland

---

[1] Elephant ivory displays unique characteristics known as Schreger lines, which are naturally occurring striations or linear marks visible on elephant ivory.

to the United States was too complicated given the various laws protecting elephant ivory. During the interview Schindler-Perten became emotional, admitting that her parents told her she would not be able to import the Defendant Property legally. Schindler-Perten further stated that she "wanted to prove them wrong."

52. Schindler-Perten provided articles, verbal statements, and a timeline to law enforcement that neither demonstrated sufficient evidence that the Defendant Property was gifted to her family, what country the Defendant Property came from, or were given to the family in, nor what year the family came into possession of the Defendant Property.

53. The documentation Schindler-Perten presented to law enforcement showed that her grandfather worked in multiple regions of Africa during his work with the Food and Agriculture Organization of the United Nations, but had no mention of ivory, gifts or awards. Schindler-Perten concluded the interview by stating that she had reached out to the U.S. Division of Management Authority prior to importation for information on legal import, but was unable to provide any verbal or documented proof that she had done so.

54. As the Defendant Property consisted of raw elephant ivory imported without a valid CITES import permit it could not be imported in compliance with CITES, the ESA, or the AECA.

### C. Form 3-177

55. A USFWS Form 3-177, Declaration for Importation or Exportation of Fish or Wildlife, is required for international shipments of wildlife to or from the United States.

56. Under the ESA, it is unlawful to import any wildlife (including any parts or products) without filing with the USFWS, a completed Form 3-177 upon the importation of any wildlife at the place where USFWS clearance is requested.

57. The Form 3-177 is another requirement that is distinct from the CITES import permit which must be obtained to import an Appendix I species.

58. Under the ESA, trade contrary to the ESA, CITES, or any regulation made pursuant to the ESA (including Parts 17 and 23 of 50 C.F.R.) violates the ESA, and failure to file a USFWS Form 3-177 is another, independent violation of the ESA.

59. The USFWS was never provided with a Form 3-177 listing the Defendant Property.

### D. The Administrative Detention and Forfeiture Proceedings

60. On or about March 5, 2020, law enforcement detained the Defendant Property for further investigation.

61. Between March 11, 2020 and March 20, 2020, Schindler-Perten corresponded with law enforcement regarding the status of the investigation. Schindler-Perten discussed the Defendant Property being returned to either her or her parent's home, and mentioned that her father would produce an affidavit.

62. On or about April 15, 2020, the law enforcement issued a Notice of Detention to Schindler-Perten via U.S. Certified Mail.

63. On or about April 20, 2020, Melissa Williams of Kerkering, Barberio & Co., sent USFWS an affidavit from Schindler-Perten's father, Peeter Perten ("Perten"). The affidavit stated that Schindler-Perten had imported the Defendant Property to the United States on his behalf and that the Defendant Property was not intended for use in Schindler-Perten's home.

64. Perten's affidavit was not consistent with Schindler-Perten's previous statements to USFWS inspectors, and did not provide any information regarding the Defendant Property's country of origin. Specifically the affidavit stated that the Defendant Property was purchased by Schindler-Perten's grandfather, not gifted to him as Schindler-Perten stated during her March 5, 2020 interview with USFWS inspectors. Moreover, Perten's affidavit states that Perten recalled seeing several African items, including "small to large tusks" collected by his mother, during visits to Senegal in 1973 or 1974 and to Sudan in 1977. Perten's affidavit does not state that the Defendant Property was among those items.

65. In his affidavit, Perten speculated that the Defendant Property was bought on the streets of Senegal for cash and without any receipts, contradicting the statement of Schindler-Perten that the country of origin was Sudan. Perten further states in his affidavit that the Defendant Property had been hanging in Perten's apartment in Switzerland. Perten noted in his affidavit that his wife moved to the United States from Switzerland in 2019, and the couple's furniture

was transported from Switzerland to the United States as part of a household move in September 2019.

66. On or about May 28, 2020, after Schindler-Perten failed to demonstrate that the Defendant Property was imported legally, USFWS seized the Defendant Property.

67. On or about June 1, 2020, USFWS sent a Notice of Seizure and Proposed Forfeiture to Schindler-Perten, notifying her of USFWS's seizure of the Defendant Property. The Notice also explained the administrative forfeiture process and identified options available to contest the proposed administrative forfeiture.

68. On or about July 20, 2020, Schindler-Perten filed a claim in the USFWS administrative forfeiture proceedings, stating that she is the owner of the Defendant Property and requesting that the Government file a judicial forfeiture action

69. In her claim, Schindler-Perten alleged that "[t]he elephant tusks have been in my family since my grandfather returned from his UN job in Africa in the early 1970s. They have been hanging in my grandparents' house when I was a little girl and, after their passing, have been hanging on parents' wall."

70. At no time did Schindler-Perten obtain or file the proper CITES import permit or Form 3-177 as required.

## IV.  CLAIMS FOR FORFEITURE

### A.  First Claim for Forfeiture- Endangered Species Act

71.  With respect to threatened species, the ESA makes it unlawful for any person subject to the jurisdiction of the United States to:

> (G)  violate any regulation pertaining to such species or to any threatened species of fish or wildlife listed pursuant to section 1533 of this title and promulgated by the Secretary pursuant to authority provided by this chapter.

16 U.S.C. §§ 1538(a)(1), 1538(b) (criminal penalties for knowing violations).

72.  Title 16, United States Code, Section 1540 provides in pertinent part that:

> All fish or wildlife or plants taken, possessed, sold, purchased, offered for sale or purchase, transported, delivered, received, carried, shipped, exported, or imported contrary to the provisions of this chapter, any regulation made pursuant thereto, or any permit or certificate issued hereunder shall be subject to forfeiture to the United States.

16 U.S.C. § 1540(e)(4)(A).

73.  Elephants are designated as a threatened species under U.S. law.

74.  Thus, the Defendant Property is subject to forfeiture pursuant to 16 U.S.C. § 1540(e)(4) as an animal imported into the United States contrary to law, in that the Defendant Property is a threatened species subject to a regulation restricting the importation of raw ivory that was transported, delivered, received, shipped, or imported, in violation of the Endangered Species Act, 16 U.S.C. § 1538(a)(1), and federal regulations pertaining to threatened species of wildlife, 50 C.F.R. Parts 17 and 23.

**B.      Second Claim for Forfeiture - Importation Contrary to Law**

75.    Title 19, United States Code, Section 1595a(c)(2)(B) subjects to seizure and forfeiture "[m]erchandise which is introduced or attempted to be introduced into the United States contrary to law" if "its importation or entry requires a license, permit or other authorization of an agency of the United States Government and the merchandise is not accompanied by such license, permit, or authorization."

76.    Thus, the Defendant Property is subject to forfeiture to the United States pursuant to 19 U.S.C. § 1595a(c)(2)(B) because its importation or entry requires a license, permit or other authorization of an agency of the United States Government and the Defendant Property was not accompanied by such license, permit, or authorization, to wit, a valid CITES Import Permit, in accordance with 50 C.F.R. § 23.20(e).

**C.      Third Claim for Forfeiture – Endangered Species Act**

77.    The Defendant Property is further subject to forfeiture pursuant to 16 U.S.C. § 1540(e)(4) because Schindler-Perten failed to file a Wildlife Declaration for the Defendant Property, another independent violation of the Endangered Species Act, 16 U.S.C. § 1538(e), and federal regulations pertaining to endangered wildlife, 50 C.F.R. 14.61.

**D.      Fourth Claim for Forfeiture - AECA Elephant Moratorium Violation**

78.    On June 9, 1989, the USFWS issued a moratorium on the importation of all ivory pursuant to 16 U.S.C. § 4222 *et seq.*, which moratorium remains in effect.

79. The Defendant Property, as raw ivory imported from a country other than an ivory producing country, could not be imported into the United States.

80. The Defendant Property was imported in violation of 16 U.S.C. § 4223(1).

81. Accordingly, the Defendant Property is subject to forfeiture and condemnation to the United States of America pursuant to 16 U.S.C. § 4224(e) and 16 U.S.C. § 1540(e)(4)(a).

## REQUEST FOR RELIEF

WHEREFORE plaintiff, the United States of America, requests that judgment be entered in its favor and against the Defendant Property, and that process issue to enforce the forfeiture of the Defendant Property, and that all persons having an interest in the Defendant Property be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the Defendant Property to the United States of America for disposition according to law, and that this Court grant the Government such further relief as this Court may deem just and proper, together with the costs and disbursements in this action.

Dated: Newark, New Jersey
October 19, 2020

        CRAIG CARPENITO
        UNITED STATES ATTORNEY

By:    */s/ Sarah Devlin*
      SARAH DEVLIN
      Assistant United States Attorney

## VERIFICATION

STATE OF NEW JERSEY         :
                            : ss.
COUNTY OF ESSEX             :

I, Fiona Lowry, here by verify and declare under penalty of perjury that I am a Wildlife Inspector with the United States Fish and Wildlife Service and that I have read the foregoing Verified Complaint for Forfeiture *in rem* and know the contents thereof, and that the matters contained in the Verified Complaint are true to my own knowledge, except that those matters herein stated to be alleged on information and belief and as to those matters I believe them to be true.

The sources of my information and the grounds of my belief include the official files and records of the United States, information supplied to me by other law enforcement officers, and my own investigation of this case.

I hereby verify and declare under penalty of perjury that the foregoing is true and correct.

                                              _____
                                              Fiona Lowry
                                              Wildlife Inspector
                                              United States Fish and Wildlife Service
                                              Office of Law Enforcement